IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| D.B., by and through his parents, M.B. and A.B., | : : | |
| Plaintiffs | : : | C.A. No. 15-cv-00085 |
| v. | : : | U.S. Magistrate Judge Baxter |
| FAIRVIEW SCHOOL DISTRICT, Defendant. | : : : | |

# MEMORANDUM OPINION[1]

United States Magistrate Judge Susan Paradise Baxter

## I. Introduction

D.B. is a student attending school in the Fairview School District ("School District" or "Fairview") in Fairview, Pennsylvania. On his behalf, D.B.'s parents filed a due process complaint during the third quarter of D.B.'s first grade year, raising concerns that Fairview was not affording D.B. the free appropriate public education (FAPE) he is entitled to under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, and that Fairview had failed to meet its Child Find obligations under 20 U.S.C. § 1412(a)(3) and 22 Pa. Code § 14.121-14.125. Plaintiff contends that the District failed to identify D.B. as disabled upon his entry into the District and waited too long to implement an appropriate individualized education plan ("IEP") for him and, accordingly, failed to provide him with a meaningful educational benefit during his kindergarten and first grade years. As a result, Plaintiff asserts that he is

---

[1] The parties have consented to having a United States Magistrate Judge exercise jurisdiction over this matter. *See* 28 U.S.C. § 636 *et seq.* (ECF Nos. 22, 25).

entitled to an award of compensatory education, an independent educational evaluation and reasonable attorneys' fees and costs.

After three days of testimony and the submission of exhibits including D.B.'s extensive educational records, the Pennsylvania Special Education Hearing Officer determined that upon entry into the School District, an evaluation team appropriately found D.B. not to be currently disabled, and accounted for and implemented a plan to resolve certain identified behavioral and anxiety issues. The Hearing Officer further concluded that the District appropriately implemented an IEP in December 2012, when screening revealed the need for specialized speech and language instruction to facilitate behavioral support. However, the District failed to conduct a reevaluation of D.B. or revisit his 2013 IEP to implement additional measures necessitated by a sudden return of disruptive behaviors in the second half of first grade, and this failure resulted in the deprivation of a meaningful education benefit for much of the remaining school year. Despite this finding, the Hearing Officer denied an award of compensatory education because it was determined that the District acted timely in the implementation of remedial measures and, as such, did not violate the IDEA.

The parties have filed cross-motions for summary judgment, with Plaintiff seeking reversal of the Hearing Officer's decision. Plaintiff contends that his Child Find claim was not considered, and that the Hearing Officer made errors of fact and law in reaching the conclusion that D.B. was not denied a FAPE during the entirety of his kindergarten and first grade years, and further erred in concluding that D.B. was not entitled to an award of compensatory education. ECF No. 41. Defendant counters that the Hearing Officer's findings of fact and conclusions of law rest soundly upon the entirety of the testimony and evidence presented in the hearing of this matter and should not be disturbed upon review by this Court. ECF No. 44.

Plaintiff's principal brief serves as his opposition to the Defendant's motion, and is accompanied by his Concise Statement of Material Facts/Proposed Findings of Fact and Conclusions of Law, the extensive record of testimony and certain of the exhibits presented in the hearing below. ECF Nos. 42, 43. Defendant has filed its responses in opposition [ECF Nos. 45, 46, 47], and the motions are ripe for review. For the reasons more fully set forth below, the Court will grant Defendant's motion for summary judgment and deny Plaintiff's motion for summary judgment.

**II. Background**

D.B. is now an eleven-year-old boy who began receiving speech support services as a toddler in a birth to age three early intervention program. In February 2012, when D.B. was approximately five years old, a preschool early intervention individualized education program was initiated after referral by his mother to address concerns about D.B.'s activity level and an inability to maintain attention. ECF No.43-1,p. 1171. The Northwest Tri-County Intermediate Unit conducted comprehensive screening, including a review of D.B.'s past medical and developmental history, observation by a service coordinator, parental and preschool teacher reviews, and a battery of cognitive, developmental and behavioral testing. The screening revealed that while D.B. satisfactorily performed on cognitive, physical, and emotional testing, he was assessed by his preschool teacher as having significant attention and aggressive behavioral issues, and was rated by her as borderline in areas of emotionally reactive behavior. ECF No. 43-1, pp. 1177-78. Accordingly, the evaluator concluded that D.B. suffered a greater than 25% delay in one or more areas of development. However, the evaluation report indicated that these delays did not impede D.B.'s learning or the learning of other children. ECF No. 43-1, pp. 1179, 1188. As a result of his identification as a child with developmental delays, D.B. was

provided services twice per month by the Intermediate Unit to improve areas of concern. ECF No. 43-1, p. 1199. In addition, because of "idiosyncratic behaviors," his parents privately consulted with a child psychologist to determine if D.B. suffered Attention-Deficit/Hyperactivity Disorder (ADHD), autism or Asperger's syndrome. ECF No. 43-1, pp. 88-89. This screening was completed in February 2012, and was negative as to each of these conditions.

Upon learning of D.B.'s intent to enroll in kindergarten, the Fairview School District began an evaluation to determine whether continuation of services was necessary. The school psychologist observed D.B. in his preschool setting over the summer of 2012, and a reevaluation team met in late August 2012 to review his early intervention testing and developmental progress. ECF No. 43-1, pp. 1195. The team included the Fairview Director of Special Education Services, the elementary school psychologist, a special education teacher, and D.B.'s mother. Based upon its review, the District concluded that D.B. was not disabled, although it acknowledged that he presented with certain behavioral and focus issues. *Id.* Team members believed that the structured, repetitive and consistent methodology of his assigned kindergarten class teacher could resolve D.B.'s issues, and the team opted to gauge D.B.'s transition into the District before identifying him as emotionally or otherwise disabled. ECF No. 43-1, pp. 337-341, 524, 525.

Shortly after the start of kindergarten, D.B.'s teacher became concerned about his behavior. D.B. exhibited an extreme response to frustration, expressed fear of the classroom toilet, had difficulty staying on task and expressing himself, and would "meltdown" by crying loudly. ECF 43-1, pp. 529-530. His classroom teacher contacted the school psychologist and school support team to request assistance. By September 20, 2012, it was determined that a speech and language assessment was necessary to address auditory processing and language

4

concerns. ECF No. 43-1, pp. 343-345, 410. Based upon this initial screening, the school requested Permission to Evaluate D.B., and scheduled the Fairview School District behavior specialist to observe D.B. in the classroom for recommendations to address his behavior. Behavioral interventions including a comprehensive positive behavior support plan were implemented, and the District behavior specialist began working with D.B. on a weekly basis in October 2012. ECF No. 43-1, pp. 530-536. Assessments for speech and language, occupational therapy, and a Functional Behavioral Assessment were completed in October and November, culminating in a timely IEP in December 2012. In the intervening months, D.B. received ongoing counseling and support by the school psychologist and the District behavioral specialist. ECF No. 43-1, pp. 351-358.

The IEP resulted in a diagnosis of a speech and language impairment, which was addressed with twice-weekly small group speech and language instruction to develop pragmatic language and social skills. In addition, D.B. received monthly occupational therapy, weekly in-school behavioral support intervention and counseling provided by the District behavior specialist, ongoing counseling and assistance from the school psychologist, and outside counseling with a community provider. ECF No. 43-1, pp. 358-360, 431-432, 1243-1255. With these supports in place, D.B. showed marked improvement, with "meltdowns" ceasing by January 2013, and no demonstrable need for in-school behavioral intervention with the District's behavior specialist by May 2013. ECF No. 43-1, pp. 640-643.

D.B.'s successful behavior and social development continued into the first half of first grade. At the time of D.B.'s IEP renewal in December 2013, it was noted that while he continued to have intermittent episodes of crying, intervention strategies employed by his teacher were largely successful, and D.B. achieved satisfactory academic progress, with advanced levels

of achievement in some areas. On measures of social skills and work habits, his progress was also evaluated as satisfactory or excellent. ECF No. 43-1, pp. 1264-1287.

A private evaluation was conducted in late October 2013, resulting in an opinion that D.B. "is a very smart, detail oriented 7-year old boy who has some difficulties with anxiety, obsessiveness and compulsiveness. He meets criteria for generalized anxiety as well as OCD, both of which are unsurprising given the high intellectual function he demonstrates." ECF No. 43-1, p. 1260. D.B. was found not to suffer hyperactivity or autism, and was determined to be socially appropriate. *Id.* D.B.'s mother provided the report to the School District in December, but in light of her satisfaction with his progress and the school services in place, she did not request an additional school evaluation to address his anxiety and OCD tendencies. ECF No. 43-1, pp. 97-98.

Unfortunately, D.B.'s academic and behavioral progress regressed immediately after the winter holiday break, and he experienced increased frustration and extreme crying episodes that were disruptive to other children and impeded his ability to learn. ECF No. 43-1, pp. 74-78, 218-219. Despite this sudden change, in-school District behavioral support was not restored and D.B.'s behavior continued to deteriorate. In March, D.B.'s parents returned to his outside child development provider, and were informed that he suffered ADHD. In the interim, D.B.'s teacher communicated with his parents regarding his behavior and sent home a sheet tracking daily conduct, but did not inform the District special education director of D.B.'s regression. D.B.'s parents contacted the school psychologist on March 6, 2014, to request an evaluation to determine if D.B. was gifted, and on April 4, 2014, his parents filed a special education due process complaint, seeking to determine D.B.'s additional support needs. ECF No. 43-1, p. 699.

6

The District special education director first learned of D.B.'s dramatic regression upon receipt of the complaint, by which time he was talking out of turn or acting out approximately 100 times per day, and had experienced failure in most academic and social areas. ECF No. 43-1, p. 650-657. The Director contacted the school psychologist, and requested completion of a revised Functional Behavior Assessment, positive behavior support plan, a full review of speech and language and occupational therapies, and renewed intellectual and academic assessments. ECF No. 43-1, pp. 699-700.

The results of each assessment were compiled in a Reevaluation Report issued in May 2014, and included D.B.'s recent diagnosis of ADHD, anxiety, OCD, and continuing needs in speech and language. A revised IEP was issued on May 9, 2014, addressing each of these concerns with goals for appropriate classroom/peer interaction and behavior. In addition, the District behavioral specialist resumed weekly counseling sessions with D.B., and his on-going case management was assigned to the school's special education teacher. ECF No. 43-1, pp. 705-709.

The Special Education Hearing of Plaintiff's due process complaint occurred over three days, commencing September 8, 2014, and ending on November 13, 2014. Based upon the testimony and exhibits presented, the Hearing Officer concluded that the District had afforded D.B. the free appropriate education he is due from his initial entry into kindergarten until February 3, 2014, the date "the District knew or should have known that it needed to request permission to re-evaluate the student." ECF No. 43-1, p. 1441. The Hearing Officer determined that as of May 9, 2014, the School District had taken the steps required to provide an appropriate IEP, and was again providing D.B. an appropriate education.

7

The Hearing Officer further determined that a compensatory education award was not indicated based upon a construction of a timeline of events required by applicable regulations. First, the Hearing Officer selected February 3, 2014, as the day the District should have known D.B.'s needs were no longer being met by his IEP because it was "the first school day of that month after four full weeks of instruction in January 2014." ECF No. 43-1, p. 1441. Citing 22 Pa. Code § 14.124(b), the Hearing Officer then noted that a school district has 60 calendar days from the date it receives permission to re-evaluate to issue its report to conduct its review. The Hearing Officer next determined that had the parents received a permission to re-evaluate form on February 3, 2014, a response likely would have been submitted on February 10, 2014. After allocating the maximum 60 days to complete the reevaluation process, the Hearing Officer determined that the reevaluation report would have been completed on April 11, 2014. Then, because federal regulations obligate a District to convene an IEP team and craft the student's IEP within 30 calendar days of an evaluation report, the last date for District action would have been May 11, 2014. Accordingly, because the District's IEP was proposed on May 9, 2014, the Hearing Officer determined that the District acted in a timely manner and an award of compensatory education was not warranted.

**III. Standard of Review**

In reviewing an appeal from a state administrative decision under the IDEA, a District Court is required to apply a "modified de novo review." *Nicholas H. v. Norristown Area School Dist.*, 2017 WL 569519, at *3 (E.D. Pa. Feb. 13, 2017)(citing *D.S. v. Bayonne Bd. of Educ.,* 602 F.3d 553, 564 (3d Cir. 2010) and *Mary T. v. School Dist. of Philadelphia*, 575 F.3d 235, 241 (3d Cir. 2009)). The Court is required to make its own findings by a preponderance of the evidence while also giving due weight to the factual findings of the Hearing Officer. *Id. See also S.H. v.*

8

*State Operated School Dist. of the City of Newark*, 336 F.3d 260, 269–270 (3d Cir. 2003); *Board of Educ. v. Rowley*, 458 U.S. 176, 206 (1982).

"Due weight" means "[f]actual findings from the administrative proceedings are to be considered prima facie correct." *S.H.*, 336 F.3d at 270. If the court departs from the administrative findings, it must explain why. *Id*. In making this determination,

> if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight. Specifically, this means that a District Court must accept the state agency's credibility determinations 'unless the nontestimonial, extrinsic evidence in the record would justify a contrary conclusion.'

*Shore Regional High School Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (citations and emphasis omitted). Finally, a court may not substitute its "own notions of sound educational policy for those of the school authorities which [it] review[s]." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, ___ U.S. ___, 137 S. Ct. 988, 1001(2017)(quoting *Rowley*, 458 U.S. at 206).

As the party seeking relief, Plaintiff bears the burden of persuasion on each of the claims presented. *D.K. v. Abington School District*, 696 F.3d 233, 243 (3d Cir. 2012).

**IV. Discussion**

The IDEA offers States federal funds to assist in educating children with disabilities. 84 Stat. 175, as amended, 20 U.S.C. § 1400 *et seq.*; see *Arlington Central School Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 295 (2006). "In exchange for the funds, a State pledges to comply with a number of statutory conditions. Among them, the State must provide a free appropriate public education—a FAPE, for short—to all eligible children. § 1412(a)(1)." *Endrew F.*, 137 S. Ct. at 993-94. A FAPE, as the Act defines it, includes both 'special education' and 'related services.' §

1401(9). 'Special education' is 'specially designed instruction ... to meet the unique needs of a child with a disability'; 'related services' are the support services 'required to assist a child ... to benefit from' that instruction. §§ 1401(26), (29). *Id.*

In providing these services, "[t]he IDEA protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide.'" *D.K. v. Abington School District*, 696 F.3d at 244 (quoting *P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009)). "Accordingly, schools must: (1) identify children in need of special education services (Child Find); and (2) provide a FAPE to disabled students." *Id.* at 244.

Plaintiff contends that the District failed to identify and provide appropriate support for D.B.'s behavioral issues as required under Pennsylvania's Child Find provision at three distinct times: (1) at the time D.B. began kindergarten; 2) September through December of D.B.'s kindergarten year; and (3) at all times thereafter. As a result, Plaintiff contends the District failed to provide a FAPE.

 a. **Child Find Claim**

Plaintiff first contends that the Hearing Officer erred by not considering his claim that the District failed to identify him as a student in need of a special education in violation of its Child Find obligations. The Court concludes that the decision of the Hearing Officer implicitly and appropriately ruled in favor of the District with regard to this claim.

The IDEA's Child Find provision requires states to ensure that "all children residing in the state who are disabled, regardless of the severity of their disability, and who are in need of special education and related services are identified, located and evaluated." 20 U.S.C.

§ 1412(a)(3). This provision places upon school districts "a continuing obligation ... to identify and evaluate all students who are reasonably suspected of having a disability under the statutes." *P.P.*, 585 F.3d at 738.

As indicated by Plaintiff, Pennsylvania's Department of Education has issued guidance on the identification of students during the transition from pre-school early intervention to school-aged programs. ECF No. 42-1. The guidance permits a school district to conduct a reevaluation of existing data and information to determine whether a child continues to be eligible for special education services upon entry into a district school. ECF No. 42-1, p. 3. If the reevaluation determines that a child is no longer eligible for special education services, the school district must issue a Notice of Recommended Educational Placement. *Id.* at 4.

A school district's failure to timely evaluate a child who it should reasonably suspect of having a disability constitutes a procedural violation of the IDEA. *D.K.*, 696 F.3d at 251. However, a school district does not necessarily violate its Child Find obligations when it fails to identify a student as disabled at the "earliest possible moment." *Id.* at 249. This is especially true where the alleged disability manifests itself in behaviors typical of very young children, "because hyperactivity, difficulty following instructions, and tantrums are not atypical during early primary school years." *Id* at 251 (citing *Board Of Educ. Of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007)("finding no violation where witnesses testified that the student's 'difficulties would not necessarily indicate a disability or a need for special education, and that it would be inappropriate to rush to identify a child that young as disabled,' [because] behavioral and learning problems [are] not atypical of immature young boys")) .

In this instance, the Court finds no violation of the District's Child Find obligations. As indicated, D.B.'s transition planning from preschool was delayed by his late entry into early

intervention services. ECF No. 43-1, p. 1194. The District conducted a reevaluation of D.B.'s status on August 7, 2012, including a thorough review of the comprehensive cognitive testing with parental and teacher assessments completed in February 2012, and an observation of D.B. in his preschool setting. ECF No. 43-1, pp. 1195-1199. The District met with D.B.'s parents on August 22, 2012, and disclosed that at that time, D.B. did not meet criteria to be identified as disabled. *Id.* D.B.'s mother was notified of her ability to request an assessment to challenge the determination, but did not do so. *Id.* Given D.B.'s young age, lack of indicators of cognitive or adaptive impairment, and his unstructured preschool environment, the Court agrees that it was reasonable to conclude that he did not meet criteria as emotionally disturbed or otherwise disabled. *D.K. v. Abington School District*, 696 F.3d at 251.

Despite D.B.'s initial classification as not disabled, the District acted promptly, within weeks of the commencement of the school year, to address behavioral and language deficits that were evident despite the change to a structured class environment. The proactive screening, functional behavior assessment, and accommodations immediately afforded to D.B. resulted in consistent intervention with the school psychologist, auditory processing services, and counseling with the District behavioral specialist. While a completed IEP was not executed until December 2012, D.B. received extra assistance and one-on-one specialist attention to address his needs throughout the fall of 2012. Under these circumstances, the School District did not breach its Child Find duty by delaying the execution of an IEP until December 2012. *Id.* at 252 (citing *Ridley School District v. M.R.*, 680 F.3d 260, 272 (3d Cir. 2012) (agreeing with a hearing officer's decision that no Child Find violation occurred where the school district's investment in "addressing [a student's] needs and providing appropriate instruction and interventions before rushing to special education identification" was apparent)).

12

Plaintiff also contends that the District violated its Child Find obligations in formulating his IEP in December 2012 when it failed to specify that D.B. required special education services to address his behavioral deficits, and failed to provide "proper supports for those services." ECF No. 43, p. 8. This position is at odds with the December 2012 IEP which, pursuant to 22 Pa. Code. § 14.133, incorporates a Positive Behavior Support Plan entered into on November 19, 2012, and provides for, *inter alia*, consultation with a District behavior specialist once per week.[2] ECF No. 43-1, pp. 1206, 1253. These services were provided throughout much of D.B.'s kindergarten year, and were included in an updated Functional Behavioral Assessment ("FBA") in February 2013, indicating an ongoing intent to address D.B.'s behavioral deficits. ECF No. 43-1, pp. 1209-1210. Accordingly, the Court finds no error of fact or law in the Hearing Officer's implicit decision that the District satisfied its Child Find obligations.

### b. FAPE 2012-2013/ 2013-2014

Plaintiff contends that the Hearing Officer further erred in concluding that the District provided a FAPE to D.B. during his kindergarten and first grade years. In particular, Plaintiff argues that the District failed to provide D.B. with transition services upon entry into kindergarten, and failed "to provide D.B. any behavioral support services during the 2012-2013 year," and "through the 2013-2014 school year, [when] it continued to observe D.B.'s behavioral difficulties and the impact on his education," and that these actions deprived him of the

---

[2] A Positive Behavior Support Plan is defined as follows:

> Positive behavior support plans—A plan for students with disabilities and eligible young children who require specific intervention to address behavior that interferes with learning. A positive behavior support plan shall be developed by the IEP team, be based on a functional behavior assessment, and become part of the individual eligible young child's or student's IEP. These plans must include methods that utilize positive reinforcement and other positive techniques to shape a student's or eligible young child's behavior, ranging from the use of positive verbal statements as a reward for good behavior to specific tangible rewards.

12 Pa. Code § 14.133(b).

education to which he was entitled. ECF No. 43, pp. 9-10.  In addition, Plaintiff argues that the District failed to properly implement D.B.'s IEP by failing to collect and store data regarding behavioral goals.

As stated *infra*, Plaintiff's contentions for the period September 2012 through December 2013 are not supported by the record.  Rather, it is evident that the District addressed D.B.'s behavioral issues beginning in September of kindergarten, when his teacher reached out to the school support team to address her concerns, and the team immediately began the implementation of behavioral interventions, counseling services, language and speech screening, and a Functional Behavioral Assessment. ECF No. 43-1, pp. 408 – 410, 425.  The FBA was incorporated into his December 2012 IEP and, for the most part, into the December 2013 IEP. These steps were largely successful as indicated by the testimony of his mother, his kindergarten teacher and his first grade teacher, all of whom expressed that D.B.'s behavior had moderated, and that he was engaging appropriately.  ECF No. 43-1, pp. 65-66, 98, 181, 202-03, 577.  While he continued to experience some periods of frustration and crying, overall, his IEP was reasonably calculated to enable D.B. to make progress in light of his circumstances, and therefore afforded him a free and appropriate public education. *Endrew F.*, 137 S.Ct. at 1002.

This result is not affected by the District's alleged failure to collect and/or retain data on D.B.'s conduct on a daily basis.  As an initial matter, it is noted that D.B.'s kindergarten teacher, with the assistance of the speech and language specialist, developed a daily behavior chart, which was provided to D.B.'s parents each day after school to reflect D.B.'s achievement of certain behavioral benchmarks.  ECF No. 43-1, pp. 443, 547, 1168.  D.B.'s behavior improved to such an extent that by January 2013, he was no longer experiencing "meltdowns" of sustained crying, and he enjoyed academic success into December 2013, earning satisfactory or proficient

14

in nearly all academic and social skill areas for the first half of first grade. ECF No. 43-1, pp. 1269-1270. The data collected, while not retained by the school district over the long-term, sufficiently tracked D.B.'s behavior to reflect the success of the IEP and strategies contained therein. Accordingly, the District implemented an IEP that reflected a comprehensive strategy to address D.B.'s behavior which, until January 2014, permitted him to make meaningful educational progress. Under these circumstances, the Court finds that the District afforded D.B. a FAPE until January 2014, even in the absence of the minute and precise data collection advocated by Plaintiff. *See Coleman v. Pottstown School Dist.*, 983 F. Supp. 2d 543, 565 (E.D. Pa. 2013), *aff'd in part*, 581 F. App'x 141 (3d Cir. 2014), *Sean C. through Helen C. v. Oxford Area School Dist.*, 2017 WL 3485880, at *11 (E.D. Pa. Aug. 14, 2017).

### c. Obligation to Reevaluate and Award Compensatory Education

Despite the progress made through December 2013, the Court agrees with the Hearing Officer that in the weeks after D.B.'s return from winter break in January 2014, it should have been apparent to his teacher and other District personnel that the modifications set forth in the December 2013 IEP were insufficient to enable D.B. to obtain a meaningful education, given his behavior and significant decline in achievement.

The IDEA requires educational authorities to "ensure that a reevaluation of each child with a disability is conducted … if conditions warrant a reevaluation …." 20 U.S.C. § 1414(a)(2), *and see* 34 C.F.R. § 300.303(a) ("[a] public agency must ensure that a reevaluation of each child with a disability is conducted … (1) if the public agency determines that the educational or related service needs, including improved academic achievement and functional performance, of the child warrant a reevaluation….").

The IDEA and its implementing regulations do not contain a time frame within which a reevaluation must be conducted. However, Pennsylvania regulations provide that, "[i]n addition to the requirements incorporated by reference in 34 C.F.R. 300.303, the reevaluation time line will be 60-calendar days …." 22 Pa. Code § 14.124(b). Once a reevaluation is conducted, federal regulations provide that the District has an obligation to convene an IEP meeting within 30 calendar days of a determination that a child needs special education and related services, and "[w]hen appropriate[,] the team will revise the IEP to address, among other things, lack of progress, necessary changes arising from reevaluation of the child, and parental input." *D.S.*, 602 F.3d at 557 (citing 20 U.S.C. § 1414(d)(4)), *and see* 34 C.F.R. § 300.323(c)(1).

In this case, the Hearing Officer determined that the District knew or should have known by February 3, 2014, that D.B.'s December 2013 IEP was not adequate to permit him to make progress. This initial delay into early February is reasonable, and allows for a young student's readjustment to school after an extended break from established routines and expectations. Moreover, the Court will not substitute its judgment to impose an earlier date where the parties entered into a revised IEP one month before, and the parents delayed their request for reevaluation which may have triggered earlier action. *See* 34 C.F.R. 300.303(a)(2), (b) (reevaluations may occur more frequently than every 3 years if the parents request a reevaluation and school district agrees one is necessary); *and see* 20 U.S.C. § 1414(d)(4)(A)(i) (the IEP Team shall review the child's IEP periodically, "but not less frequently than annually, to determine whether the annual goals for the child are being achieved").

With the Hearing Officer's reasonable selection of February 3, 2014, as the date by which it should have been apparent that a reevaluation was warranted, the Hearing Officer then correctly noted that federal and Pennsylvania regulations permit a district 90 days after the

16

execution of a permission to reevaluate form by a student's parents within which to complete the reevaluation and to meet to effectuate a revised IEP. The Hearing Officer reasonably determined that the parents would have returned the consent form within 7 days, by February 10, 2014,[3] thereby providing the district until May 11, 2014, to comply with the required timeline for a reevaluation and IEP meeting.

As indicated above, the parents filed their due process complaint on April 4, 2014. The District requested permission to conduct a reevaluation on April 8, 2014, and revised D.B.'s FBA and behavior support plan by April 10, 2014. Reevaluation testing and data review were complete by April 24, 2014, and the reevaluation report and revised IEP were resolved and discussed with D.B.'s parents on May 9, 2014. ECF No. 43-1, pp. 1288, 1292, 1297, and 1326. As a result of these measures, D.B. was identified as disabled due to health impairments related to his diagnoses of ADHD, OCD and anxiety, as well as his earlier diagnosed speech and language impairments. The updated IEP and revised Positive Behavior Plan provided for the resumption of weekly consultations with the District behavior specialist, recommendations for psychiatric care, joining an in-school morning running club, modifications to testing, writing assignments and access to a learning support specialist. ECF No. 43-1, pp. 1305-06.

While the delay to initiate a reevaluation is unfortunate, in this instance it did not result in a procedural or substantive violation of the IDEA. Accordingly, this Court will not disturb the Hearing Officer's conclusion that the facts of record do not support a compensatory education award. *See P.P.,* 585 F.3d at 738 (where the District took an "unduly long time to complete its

---

[3] The selection of 7 days is favorable to Plaintiff based upon the evidence of record which indicates that it took the parents 14 days in March 2014 to execute a permission to evaluation form to determine if D.B. met gifted criteria, and 9 days to consent to the April 2014 reevaluation. ECF No. 43-1, pp. 1368 – 70, 1292 – 93.

evaluation," but the evaluation was substantively appropriate, a procedural violation cannot support a compensatory education award).

## V. Conclusion

For the foregoing reasons, the Hearing Officer's decision is supported by the evidence presented and is affirmed in all respects. Accordingly, the Court grants Defendant's motion for summary judgment [ECF No. 44] and denies Plaintiff's motion for summary judgment [ECF No. 41]. An appropriate order follows.

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
U.S. Magistrate Judge

Dated: October 31, 2017

cc:	All counsel of record via CM/ECF